No. 99-185

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 381

304 Mont. 1

16 P. 3d 1042

LIBBY SLEATH, MARY ANN HAYES,

GLENDA TRUESDELL, and MARY OWEN,

Plaintiffs/Appellants,

v.

WEST MONT HOME HEALTH SERVICES,

INC., WEST MONT HOME MANAGEMENT

SERVICES, INC., ORKIN EXTERMINATION

COMPANY, INC., and EP CO., INC., and

ROFAN SERVICES, INC., d/b/a DOWELANCO,

Defendants/Respondents.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Peter Michael Meloy, Meloy & Morrison, Helena, Montana; Tom Scheuneman, Corona Del Mar, California

For Respondent DowElanco:

Ronald F. Waterman, Gough, Shanahan, Johnson & Waterman, Helena, Montana; Andrew J. Detherage, Charles P. Edwards, Barnes & Thornburg, Indianapolis, Indiana

Heard: January 11, 2000

Submitted: February 15, 2000

Decided: December 28, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Appellants Libby Sleath, Mary Ann Hayes, Glenda Truesdell, and Mary Owen brought this personal injury action against Respondents West Mont Home Health Services, Inc. and West Mont Home Management Services, Inc. (collectively referred to as "West Mont"); Orkin Extermination Company, Inc. (Orkin); and Ep Co., Inc. and Rofan Services, Inc. d/b/a DowElanco (collectively referred to as "DowElanco"), for injuries Appellants allegedly suffered when Orkin applied a pesticide manufactured by DowElanco at the West Mont building where plaintiffs worked. The District Court for the First Judicial District, Lewis and Clark County, granted summary judgment in favor of DowElanco on the basis that Appellants' claims are preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). We reverse and remand for further proceedings

consistent with this opinion.

¶2 Appellants present the following issues for review:

¶3 1. Whether Appellants' failure to warn claims, pleaded in negligence, strict liability, and breach of express warranty, are preempted by FIFRA because they are based upon or implicate the pesticide's labels.

¶4 2. Whether the failure to warn claims in Appellants' negligence and strict liability theories of liability are preempted by FIFRA when Appellants were not purchasers or users of the pesticide and were, instead, unwitting bystanders who never saw the pesticide's labels and who suffered injury from the use of the pesticide by others.

¶5 3. Whether Appellats' strict liability for design defect theory of liability is preempted by FIFRA.

¶6 Because we conclude that Issue 1 is dispositive, we do not address Issues 2 and 3.

## Factual and Procedural Background

¶7 Appellants worked in a building in Helena owned by their employer, West Mont. Sometime in 1991, West Mont ordered that all windows in the building be closed and that the operating cranks for the windows be removed, thereby preventing fresh air ventilation of the building. Between 1991 and 1994, Orkin applied various pesticides, collectively referred to here as Dursban, to the interior of the West Mont building every three to six weeks without prior or subsequent warnings to Appellants. These pesticides were manufactured and sold by DowElanco.

¶8 Each of the Appellants began suffering from various physical ailments and were forced to leave their employment on advice of their physicians. Appellant Hayes worked in the West Mont building until June 28, 1993; Appellant Owen worked until July 12, 1993; Appellant Truesdell worked until August 24, 1993; and Appellant Sleath worked until May 1994. Appellants first learned that they were routinely exposed to Dursban in 1995 when they requested information from West Mont about the pesticide applications. Prior to 1995, Appellants were unaware that they had been exposed to Dursban.

¶9 Dursban is DowElanco's registered trademark for a group of insecticides developed, manufactured, and marketed by DowElanco. The active ingredient in each of the Dursban

products is a synthetic chemical compound known as chlorpyrifos which is one of a group of compounds known as organophosphates. Organophosphates are synthetic chemical relatives of the nerve gases used in World Wars I and II. They are central and peripheral nervous system poisons that inhibit the action of the enzyme acetylcholinesterase.

¶10 Depending on exposure frequency and dosage levels, the toxicity to the central and peripheral nervous systems can cause symptoms such as headaches, dizziness, flu-like malaise, urinary frequency, confusion and difficulties with memory and concentration. Each of the Appellants exhibits one or more of these symptoms, all of which are toxicologically consistent with excessive exposure to chlorpyrifos as contained in Dursban.

¶11 Dursban's labels are registered in accordance with FIFRA and its implementing regulations. Each of the Dursban labels relevant to this case contains the following statement:

> DowElanco warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes stated on the label when used in strict accordance with the directions, subject to the inherent risks set forth below.

¶12 DowElanco markets and sells its Dursban products only to professional applicators, distributors, and formulators. It does not market or sell Dursban products to the general public. In fact, Dursban's labels require that it be applied by, or under the direction of, commercial applicators.

¶13 On January 5, 1996, Appellants filed a complaint against West Mont, Orkin, and DowElanco. Thereafter, on October 9, 1996, Appellants, with leave of the District Court, filed their Second Amended Complaint wherein they alleged that West Mont was negligent for failing to ensure that the building in which Appellants were working was free from hazardous chemicals and for failing to warn Appellants and other employees about the possible health risks of the pesticides applied in the building. Appellants also alleged that Orkin negligently and carelessly failed to give warning or otherwise take steps to ensure that Appellants and others would not be exposed to the pesticide's adverse effects.

¶14 As to DowElanco, the complaint alleged negligent design and manufacture of Dursban, strict products liability for the design and manufacture of Dursban, and breach of express and implied warranties. Moreover, the negligence and strict liability theories contained allegations that DowElanco failed to provide adequate warnings about the

dangers of Dursban.

¶15 During the course of discovery, DowElanco served each Appellant with an identical set of 15 interrogatories. Appellants' answers to these interrogatories were nearly identical. And, in response to many of these interrogatories, Appellants referred to Dursban's labels.

¶16 On February 24, 1998, DowElanco moved for summary judgment on the basis that all of Appellants' claims are preempted by FIFRA because Appellants' complaint and interrogatory answers show that Appellants' theories of liability are all based solely upon inclusions in or omissions from Dursban's labels. The specific provision in FIFRA to which DowElanco refers is 7 U.S.C. § 136v(b), which provides:

> (b) Uniformity
>
> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

¶17 Appellants responded to DowElanco's motion for summary judgment by redacting their interrogatory answers to exclude specific references to Dursban's labels. Appellants also submitted a supplemental affidavit from Robert K. Smith, Ph.D., one of Appellants' proposed expert witnesses, setting forth his opinion that Dursban is defective and unreasonably dangerous "in the context of interior workplace application of those products."

¶18 DowElanco moved to strike this supplemental affidavit, but the District Court denied the motion. The court determined, however, that even considering the supplemental affidavit and excluding references to Dursban's labels in Appellants' interrogatory answers, all of Appellants' claims are based on Dursban's labels. Hence, the District Court concluded that pursuant to this Court's opinion in *McAlpine v. Rhone-Poulenc Ag. Co.* (1997), 285 Mont. 224, 947 P.2d 474, all of Appellants' claims against DowElanco are preempted by FIFRA. Accordingly, the District Court granted summary judgment in favor of DowElanco.

## Standard of Review

¶19 Our standard of review in appeals from summary judgment rulings is *de novo. Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21(citing

*Motarie v. N. Mont. Joint Refuse Disposal* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785). When we review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Oliver*, ¶ 21 (citing *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903). We set forth our inquiry in *Bruner* as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

*Oliver, ¶ 21 (quoting Bruner, 272 Mont. at 264-65, 900 P.2d at 903).*

¶20 Moreover, in a summary judgment proceeding, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment. *Oliver*, ¶ 22 (citing *Joyce v. Garnaas*, 1999 MT 170, ¶ 8, 295 Mont. 198, ¶ 8, 983 P.2d 369, ¶ 8). Consequently, we will view the evidence in the light most favorable to the Appellants and all reasonable inferences will be drawn in their favor.

## Issue 1.

¶21 *Whether Appellants' failure to warn claims, pleaded in negligence, strict liability, and breach of express warranty, are preempted by FIFRA because they are based upon or implicate the pesticide's labels.*

¶22 The United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "It is basic to this constitutional command that all conflicting state provisions be without effect." *Maryland v. Louisiana* (1981), 451 U.S. 725, 746, 101 S.Ct. 2114, 2128-29, 68 L.Ed.2d 576 (citing *McCulloch v. Maryland* (1819), 17 U.S. 316, 427, 4 Wheat. 316, 4 L.Ed. 579; *Hines v. Davidowitz* (1941), 312 U. S. 52, 61 S.Ct. 399, 85 L.Ed. 581).

¶23 This preemptive power is not to be found carelessly, however.

> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," . . . we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Medtronic, Inc. v. Lohr (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (quoting Rice v. Santa Fe Elevator Corp. (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447). See also Cipollone v. Liggett Group, Inc. (1992), 505 U.S. 504, 516, 112 S. Ct. 2608, 2617, 120 L.Ed.2d 407. Thus, the purpose of Congress "is the ultimate touchstone" in every preemption case. Medtronic, 518 U.S. at 485, 116 S.Ct. at 2250 (quoting Retail Clerks v. Schermerhorn (1963), 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L. Ed.2d 179).*

¶24 Congress's intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617 (quoting *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L. Ed.2d 604). Furthermore,

> [i]n the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.

*Cipollone, 505 U.S. at 516, 112 S.Ct. at 2617 (internal quotations and citations omitted).*

¶25 FIFRA was first enacted by Congress in 1947 to regulate pesticides. The 1947 Act required pesticide manufacturers to register pesticides with the Secretary of Agriculture, to display poison warnings on the labels of highly toxic pesticides, and to include other warning statements to prevent injury to people, animals and plants. In 1949, the Secretary of Agriculture, under the authority of FIFRA, issued substantial pesticide labeling requirements. In 1970, the authority for pesticide regulation was transferred to the newly created Environmental Protection Agency (EPA), which now administers the pesticide

labeling requirements imposed by the Department of Agriculture.

¶26 In 1972, Congress enacted sweeping amendments to FIFRA, largely in response to public concerns over the health risks of the pesticide DDT. The 1972 amendments established that the primary purpose of federal pesticide regulation is the protection of human health and the environment from the risks posed by pesticides. While FIFRA had previously regulated pesticides primarily through labeling requirements, the 1972 amendments established federal regulation of pesticide use, an area previously regulated exclusively by the states.

¶27 The 1972 amendments established a program of federal-state cooperation in regulating pesticides. Under this program, the EPA registers pesticides for a particular use and approves pesticide labels. In doing so, FIFRA requires that the EPA must determine whether the pesticide's composition is such as to warrant the proposed claims for it; whether the labeling and other materials comply with FIFRA; whether the pesticide will perform its intended function without unreasonable adverse effects on the environment; and whether the pesticide will have unreasonable adverse effects on the environment when used in accordance with widespread and commonly recognized practices. Pursuant to a 1978 amendment, the EPA does not evaluate pesticide label claims regarding efficacy or otherwise regulate efficacy in approving pesticide labels.

¶28 States retain broad authority to regulate the sale and use of pesticides. Under 7 U.S.C. § 136v(a), states may regulate pesticide sales or use more strictly than the federal government. Under 7 U.S.C. § 136v(c) and its accompanying regulations, states may register pesticides for local uses in addition to those approved by the EPA and may impose supplemental labeling requirements regarding those additional uses.

¶29 The term "label" means "the written, printed, or graphic matter on, or attached to, the pesticide . . . or any of its containers or wrappers." 7 U.S.C. § 136(p)(1). The term "labeling" means "all labels and all other written, printed, or graphic matter--(A) accompanying the pesticide . . . at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide. . . ." 7 U.S.C. § 136(p)(2). The EPA has specific regulations concerning content, placement, type size, and prominence of warnings and precautionary statements on a label. See 40 C.F.R. § 156.10. The final form of the printed labeling for a pesticide must be submitted to and accepted by the EPA before registration. 40 C.F.R. § 156.10(a)(6). Once the EPA approves a label, the manufacturer may not change it without the EPA's approval. *Worm v. American Cyanamid Co.* (4th Cir.

1993), 5 F.3d 744, 747.

¶30 In the case *sub judice*, Appellants ask this Court to revisit its decision in *McAlpine v. Rhone-Poulenc Ag. Co.* (1997), 285 Mont. 224, 947 P.2d 474, insofar as it holds that state law claims based on a failure to warn are preempted by FIFRA to the extent that they expressly or implicitly challenge the adequacy of the warnings in a pesticide's label. Appellants maintain that this Court reached its conclusion in *McAlpine* by following the decisions holding that the preemption language of FIFRA should be given the same effect as the statute governing cigarette advertising that the United States Supreme Court construed in *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 112 S.Ct. 2608, 120 L. Ed.2d 407.

¶31 Appellants present three reasons why we should revisit our decision in *McAlpine*. First, Appellants argue that a plain reading of the parties' briefs in *McAlpine* confirms that all parties to that appeal simply assumed that *Cipollone* was controlling on the question of FIFRA's preemption language and never examined the validity of that proposition.

¶32 Second, Appellants point out that none of the parties' briefs in *McAlpine* mentioned *Medtronic, Inc. v. Lohr* (1996), 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, wherein the Supreme Court stated that the preemption language of the Medical Device Amendments of 1976 (the MDA), which is similar to FIFRA's preemption section, does not preempt state law failure to warn claims regarding medical devices even though they are properly labeled pursuant to the MDA. *Medtronic*, 518 U.S. at 501-02, 116 S.Ct. at 2258. Appellants argue that *Medtronic* demonstrates that when a federal regulatory statute consistently uses the term "requirement" to mean positive legislative or administrative enactments, and there is no indication in the statute's legislative history that Congress intended to preempt state common law, the term "requirements" does not include common law damage actions.

¶33 Third, Appellants point out that the United States Department of Justice, representing the EPA, filed an *amicus curiae* brief in *Etcheverry v. Tri-Ag Service, Inc.* (Cal. 2000), 993 P.2d 366, articulating the Government's position that FIFRA does not preempt any state law theories of liability, including failure to warn claims that implicate pesticide labels. Appellants argue that the EPA's view of the scope of FIFRA's preemptive effect is entitled to substantial weight because the EPA is charged by Congress with overseeing the primary enforcement responsibility of the states under FIFRA, and thus the EPA is uniquely qualified to determine whether a particular form of state law should be

preempted. Appellants also argue that the EPA's brief is a record of the California Supreme Court within the meaning of Rule 202(b)(6), M.R.Evid., and that this Court may take judicial notice of it pursuant to Rules 202(d)(2) and (f)(2), M.R.Evid.

¶34 DowElanco argues on the other hand, that Congress expressly stated its intent to preempt state law under FIFRA when it amended § 136v(b) in 1972 to read:

> [A] State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this Act.

In addition, DowElanco maintains that Appellants' argument that this Court was inadequately advised when it decided *McAlpine* has been waived by Appellants' failure to raise the argument in the District Court and that, even so, Appellants' argument is without merit. DowElanco argues that the United States Supreme Court's decision in *Medtronic,* wherein the Supreme Court construed a different statute, does not alter preemption analysis under FIFRA. Moreover, DowElanco argues that even though *Medtronic* was decided nearly two years before Appellants filed their response to DowElanco's motion for summary judgment, Appellants did not make any argument to the District Court based on *Medtronic* or even cite to *Medtronic* in their response to DowElanco's motion for summary judgment. Hence, DowElanco contends that Appellants waived their *Medtronic* argument.

¶35 DowElanco correctly points out that this Court has repeatedly held that we will not address either an issue raised for the first time on appeal or a party's change in legal theory. *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15. However, this Court has never applied this rule to cases. Indeed, we have decided issues based on cases neither side cited. *See DeTienne Associates v. Montana Rail Link,* (1993), 261 Mont. 238, 241, 862 P.2d 1106, 1107-08. *Medtronic* does not raise an issue for the first time on appeal or raise a new theory of liability. It simply represents further legal support for the preemption issue. "In our *de novo* review of a district court ruling on summary judgment, we are not bound by the legal authority presented in the district court." *Thomas v. Northwestern Nat. Ins. Co.*, 1998 MT 343, ¶ 22, 292 Mont. 357, ¶ 22, 973 P.2d 804, ¶ 22.

¶36 DowElanco also objects to Appellants' contention that this Court should consider and give deference to the EPA's brief in *Etcheverry*. DowElanco maintains that courts do not give deference to an agency's statutory interpretation which is contrary to the plain

language of a statute, as determined by the courts. DowElanco argues that Appellants have put the cart before the horse because the initial question is whether Congressional intent can be ascertained by the language of the statute and traditional tools of statutory interpretation. Moreover, DowElanco argues that the rule of deference to agency statutory interpretations does not apply to an agency's litigation position.

¶37 In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, the United States Supreme Court stated: "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." In this case, because the EPA is the agency charged with administering FIFRA, we agree with Appellants that we should consider the EPA's brief in *Etcheverry* and that the EPA's interpretation of FIFRA should receive deference.

¶38 Moreover, the EPA was not a party in any of the previous actions regarding FIFRA and had not previously expressed an opinion in court on whether FIFRA preempts state-law damages actions. As a result, we did not have the benefit of the EPA's position on FIFRA preemption when we decided *McAlpine*. Nor did we have the benefit of the United States Supreme Court's decision in *Medtronic*. Consequently, we take this opportunity to revisit our decision in *McAlpine* insofar as it holds that state law claims based on a failure to warn are preempted by FIFRA.

¶39 In *McAlpine*, several farmers brought a products liability action against the manufacturer and distributor of a herbicide alleging that they suffered damage as a result of defendants' failure to warn them that the herbicide could damage their crops if applied in cool weather. We held in *McAlpine*, that because the plaintiffs' negligence claim was based solely on the insufficiencies in the product's warning label, that claim was preempted by FIFRA. *McAlpine*, 285 Mont. at 231-32, 947 P.2d at 478. We also held that FIFRA did not preempt plaintiffs' breach of warranty and strict liability claims to the extent that those claims did not rely on representations made on the product's label. *McAlpine*, 285 Mont. at 232-33, 947 P.2d at 478-79.

¶40 We predicated our decision in *McAlpine* on the United States Supreme Court's decision in *Cipollone* wherein the Supreme Court interpreted a portion of the Public Health Cigarette Smoking Act of 1969 that provided:

(b) No requirement or prohibition based on smoking and health shall be imposed

under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

*Cipollone, 505 U.S. at 515, 112 S.Ct. at 2617 (quoting 15 U.S.C. § 1334(b)).*

¶41 The plaintiff in *Cipollone* claimed that the defendant tobacco company caused his mother's death by failing to provide adequate warnings on its cigarettes and by misrepresenting the dangers of smoking to the public. *Cipollone*, 505 U.S. at 508, 112 S. Ct. at 2613. The Supreme Court determined in *Cipollone* that:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law: to the contrary, those words easily encompass obligations that take the form of common-law rules.

*Cipollone, 505 U.S. at 521, 112 S.Ct. at 2620. On that basis, the Supreme Court held that state law failure to warn claims are preempted insofar as they require a showing that a defendant's cigarette advertising "should have included additional, or more clearly stated, warnings." Cipollone, 505 U.S. at 524, 112 S.Ct. at 2621.*

¶42 In our discussion of *Cipollone* in *McAlpine*, we noted that

> [a]ll of the circuit courts, and several state supreme courts, that have considered the effect of FIFRA's preemption clause have concluded that it should be given the same effect as the preemption clause interpreted in *Cipollone*. . . . Thus, for purposes of determining the scope of FIFRA preemption, *Cipollone* provides the appropriate framework for our analysis.

*McAlpine, 285 Mont. at 229-30, 947 P.2d at 477 (citations omitted). Hence, we determined in McAlpine that, as in the cigarette labeling statute at issue in Cipollone, the phrase "requirement" in § 136v(b) of FIFRA includes state common law damage actions. McAlpine, 285 Mont. at 230, 947 P. 2d at 477. Consequently, we concluded that FIFRA preempts state tort claims to the extent that they arise from an omission or inclusion in a product's label, but that claims alleging a product, manufacturing, or design defect; claims alleging negligent design, testing, or manufacturing; or claims alleging breach of warranty that do not rely on such an omission or inclusion in the product's label, are not preempted. McAlpine, 285 Mont. at 230, 947 P.2d at 477.*

¶43 However, as pointed out by Appellants in their brief on appeal and as we noted earlier in this opinion, we did not have the benefit of the Supreme Court's decision in *Medtronic* in making our determination in *McAlpine*. The Supreme Court held in *Medtronic* that in spite of its earlier decision in *Cipollone*, the preemption provision at issue in *Medtronic* did *not* preempt state common law damage actions.

¶44 In *Medtronic*, a pacemaker recipient's pacemaker failed resulting in a "complete heart block" that required her to undergo emergency surgery. According to her physician, the likely cause of the failure was a defect in the lead that transmits the heartbeat-steadying electrical signal from the "pulse generator" to the heart itself. The pacemaker recipient brought an action against the pacemaker manufacturer asserting claims of negligence and strict liability. *Medtronic*, 518 U.S. at 480-81, 116 S.Ct. at 2248.

¶45 The preemption statute at issue in *Medtronic* provided:

State and local requirements respecting devices

(a) General rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement--

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

*Medtronic, 518 U.S. at 481-82, 116 S.Ct. at 2248-49 (quoting 21 U.S.C. § 360k(a)).*

¶46 A four-Justice plurality held in *Medtronic* that distinct features of the MDA mandated the conclusion that Congress intended only to preempt states from imposing positive law "requirements" on medical devices in the form of regulations or laws and did not intend to preempt common law damage actions. *Medtronic*, 518 U.S. at 488-89, 116 S.Ct. at 2252. The *Medtronic* plurality found five key differences in the statutory schemes of the 1969 Cigarette Act and the MDA that mandated the conclusion that Congress did not intend the word "requirements" to mean the same thing in both statutes.

¶47 First, the preemption of state authority resulting from the 1969 Cigarette Act prevented only "a limited set of state requirements"--requirements imposed on advertising regarding the health effects of cigarettes, while preemption of common law actions as a result of the MDA would extinguish all state law design defect claims regarding all medical devices. Second, the MDA provided no private damages action that would replace state common law actions. Third, the MDA's preemption provision, unlike the 1969 Cigarette Act's, expressed congressional concern "with the problem of specific, conflicting state statutes and regulations rather than the general duties enforced by common-law actions." Fourth, unlike the 1969 Cigarette Act, the MDA uses the word "requirements" in numerous provisions, and each use clearly refers only to statutory and regulatory law, not common law. Fifth, the legislative history of the MDA reveals no reference in the hearings, committee reports, or debates that suggests a congressional intent to preempt all common-law remedies. *Medtronic*, 518 U.S. at 487-91, 116 S.Ct. at 2251-53.

¶48 In the same way, while the term "requirements" may encompass common law duties in some contexts, the text, legislative history, and purposes of FIFRA demonstrate that Congress had no intent that the use of the term "requirements" in § 136v(b) would extinguish state common law damage actions. As the EPA noted in its *amicus* brief in *Etcheverry*:

> When § 136v(b) was enacted in 1972, state law actions against pesticide manufacturers for failure to warn were a commonplace and uncontroversial feature of the legal landscape. No evidence from the text or legislative history of FIFRA suggests that Congress had any intent to extinguish those actions or that Congress even considered doing so. Indeed, Congress amended FIFRA in 1972 out of increasing concern for the human health and the environmental effects of pesticides such as DDT. Given that FIFRA establishes no private damages remedy for those injured by pesticides, it would be astonishing that, without any discussion, Congress could have intended to deprive injured persons of all means of relief.

¶49 FIFRA's text demonstrates that Congress had no intent to extinguish damages remedies under state common law. For example, in § 136v, Congress used the term "requirements" to mean "regulation," a term connoting positive commands of law, not court orders to pay damages for the harms caused by pesticides. Section 136v(a) provides that "[a] State may regulate" the sales or use of pesticides as long as the state "regulation" does not permit a sale or use prohibited by FIFRA. Section 136v(b) forbids "[s]uch state"

from regulating labeling by imposing labeling "requirements" in addition to or different from those required under FIFRA. The plainest reading of the two subsections is that a state may "regulate" pesticide sales or use, but in doing so may not impose labeling "requirements." In other words, § 136v(b)'s prohibition on state labeling "requirements" represents an exception to § 136v(a)'s general grant of state authority to "regulate" pesticide sales and use.

¶50 The *Medtronic* plurality interpreted the term "requirements" in the MDA's preemption provision by examining its usages throughout the MDA. In doing so, the plurality adhered to "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop* (1990), 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (internal quotations and citations omitted).

¶51 The term "requirements" appears in FIFRA 75 times. No court considering preemption under FIFRA ever addressed the meaning of "requirements" in the entire context of FIFRA; courts only looked at it in terms of § 136v(b). However, in each instance other than § 136v(b), Congress intended the term "requirements" to mean enactments of positive law by legislative or administrative bodies. It is inconceivable that Congress intended that § 136v(b) would be the only section of FIFRA in which the term "requirements" includes the application of general rules of common law by judges and juries.

¶52 Throughout FIFRA, the term "requirements" refers exclusively to positive enactments of statutory and regulatory law. Accordingly, the term "requirements" should be given the same reading in § 136v(b). Simply because the term "requirement" was found in *Cipollone* to encompass common law actions for damage, does not preclude this Court from reaching a contrary result in this case. "Only mischief can result if [the same words appearing in different statutes] are given one meaning regardless of the statutory context." *Lee v. Madigan* (1959), 358 U.S. 228, 231, 79 S.Ct. 276, 278, 3 L.Ed.2d 260.

¶53 Moreover, subsections (a) and (c) of § 136v demonstrate that Congress intended to authorize states to take actions that may indirectly prompt pesticide manufacturers to change their labels. Indirect pressure on pesticide manufacturers to change their labels, which may result from liability in damage actions, cannot be characterized as labeling "requirements." A state court award of damages for failure to warn does not mandate any change in labeling. Rather, it merely requires that a pesticide manufacturer pay money to

an injured person. While a damage award may prompt a pesticide manufacturer to seek the EPA's approval for a change in labeling, it does not directly command such a change. As the EPA points out, such indirect pressure cannot reasonably be characterized as imposing labeling requirements.

¶54 Indeed, indirect pressure to change a pesticide label does not frustrate Congress's purpose of establishing nationally uniform pesticide labels. The EPA approves only one label per pesticide. In approving a labeling change, the EPA substitutes a new nationally uniform label. This process is the same whether the labeling change is prompted by state damage liability or state regulation authorized by FIFRA.

¶55 In addition, FIFRA's legislative history does not demonstrate a Congressional intent to extinguish actions for damages. As the EPA noted in its *amicus* brief, when § 136v(b) was enacted, common law actions against pesticide manufacturers for failure to warn were a "well-recognized and uncontroversial feature of the legal landscape." Common law actions for inadequate, misleading, or false representations regarding pesticides were available as early as 1884. And, in the first part of this century, dozens of reported decisions recognized the availability of actions for false or inadequate representations regarding pesticides, including actions based on pesticide labels. After FIFRA was enacted in 1947, the federal government issued substantial labeling regulations, but state and federal courts uniformly concluded that the federal pesticide labeling regulations did not alter the availability of state law damage actions for inadequate labeling. By 1972, when § 136v(b) was enacted, nearly every state and federal jurisdiction recognized pesticide manufacturer and dealer liability both for personal injuries and crop damage resulting from the failure to provide adequate warnings.

¶56 FIFRA's legislative history reveals no intent to alter the availability of common law remedies. In 1971 and 1972, three House and Senate committees devoted 25 days to hearings on proposed pesticide legislation. In the thousands of pages of transcripts of the hearings and floor debates, there is no suggestion that the 1972 amendments to FIFRA would preempt state tort law.

¶57 For instance, in the committee hearings, testifying on behalf of the Administration and the EPA, which drafted the bill that formed the basis of the 1972 amendments, the EPA's General Counsel, John Quarles, testified as follows:

   I would like to emphasize that the States have played a major and continuing role in

pesticides regulation . . . . We wish to encourage and not supplant these efforts by providing that States may prohibit the use of a particular pesticide within their jurisdiction even if the pesticide is registered under the Federal authority. States thus are not precluded from imposing stricter standards or added requirements, but they may not permit any sale or use of a pesticide which is prohibited under the authority of the Act.

The EPA's brief in *Etcheverry* at 24-25 (quoting the Federal Pesticide Control Act of 1971: Hearings Before the House Committee on Agriculture, 92d Congress (1971) at 8).

¶58 These hearings reveal that Congress had no intent to preempt state tort law. Quarles testified as the first witness in the first hearing, stating unequivocally: "The bill does not affect tort liability." EPA's brief at 28 (quoting House Ag. Comm. Hearing at 42). No one disagreed and no witness or member of Congress suggested that FIFRA would alter common law duties or affect the availability of tort damages.

¶59 In addition, the four House and Senate Committee reports describe in detail the changes that the 1972 amendments would bring to federal pesticide regulation. Each report summarizes the changes made by the bill, but none mentions any intent to preempt state damage actions.

¶60 Furthermore, the House and Senate debated the 1972 FIFRA amendments over 5 days. Like the committee hearings and reports, the floor debates reveal no suggestion of a Congressional intent to preempt state tort law. The preemption provision was not mentioned on the floor of the Senate. The preemption provision was debated at length on the floor of the House, but nowhere in the debate is there a suggestion that the preemption provision would affect state tort law.

¶61 Therefore, as pointed out by EPA, rather than reveal an intent to extinguish state common law damage remedies, the legislative history of the 1972 FIFRA amendments is replete with evidence that Congress understood and intended that state damage actions would remain available. Moreover, there is a presumption against preemption of common law remedies. *Medtronic*, 518 U.S. at 485-86, 116 S.Ct. at 2250; *Cipollone*, 505 U.S. at 518, 523, 112 S.Ct. at 2618, 2621. That long standing presumption can only be overcome by evidence of a "clear and manifest" intent of Congress to preempt state law. *See Wisconsin Public Intervenor v. Mortier* (1991), 501 U.S. 597, 610, 111 S.Ct. 2476, 2484, 115 L.Ed.2d 532. In the absence of evidence that Congress intended to alter then existing

law, FIFRA should not be interpreted to do so.

¶62 Furthermore, preemption of state tort law would conflict with FIFRA's purposes. The 1972 FIFRA amendments were enacted to address growing public concern with the environmental and public health effects of pesticides such as DDT. The fact that there is no federal private damage remedy, that Congress was aware of state damage remedies, and that Congress decided to give the states the primary enforcement authority under FIFRA, all strongly imply that Congress did not intend to preempt state common law damage remedies. Given that the 1972 amendments to FIFRA were intended to provide increased public protection against the harms caused by pesticides, it would make no sense to infer that Congress intended to close off all avenues of judicial relief for those injured by pesticides.

¶63 The *Medtronic* plurality adopted similar arguments in interpreting the MDA. Absent a federal private cause of action, preemption of state common law damage actions would effectively bar relief to persons injured by defective medical devices and "have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation. . . ." *Medtronic*, 518 U.S. at 487, 116 S.Ct. at 2251. "It is to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct,' and it would take language much plainer than the text of § 360k to convince us that Congress intended that result." *Medtronic*, 518 U.S. at 487, 116 S. Ct. at 2251 (quoting *Silkwood v. Kerr-McGee Corp.* (1984), 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443). In the same way, FIFRA's preemptive force should not be interpreted to undermine the statutory purpose to provide increased protection from harmful pesticides.

¶64 We conclude that Congress intended the term "requirements" in § 136v(b) of FIFRA to mean enactments of positive law by legislative or administrative bodies, not state law damage actions. Consequently, we overrule our prior decision in *McAlpine* for holding otherwise.

¶65 Accordingly, we hold that Appellants' claims are not preempted by FIFRA and that the District Court erred in granting summary judgment in favor of DowElanco on that basis.

¶66 Reversed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ THOMAS M. McKITTRICK

District Judge sitting for Justice W. William Leaphart

Justice Karla M. Gray, dissenting.

¶67 I dissent from the Court's opinion. We resolved the dispositive issue in this case, whether failure to warn claims--pleaded in negligence, strict liability and breach of express warranty--are preempted by FIFRA, a scant three years ago in *McAlpine*, holding such claims are preempted to the extent they expressly or implicitly challenge the adequacy of the warnings in a pesticide's label. I would hold that *McAlpine* is controlling and affirm the District Court.

¶68 *Stare decisis*, which means to abide by or adhere to decided cases, is of fundamental and central importance to the rule of law. *State v. Gatts* (1996), 279 Mont. 42, 51, 928 P.2d 114, 119 (citations omitted). It is a " 'fundamental doctrine which reflects our concerns for stability, predictability and equal treatment. . . .' " *Gatts*, 279 Mont. at 51, 928 P.2d at 119 (quoting *Formicove, Inc. v. Burlington Northern, Inc.* (1983), 207 Mont. 189, 194, 673 P.2d 469, 472). The doctrine is meant to keep courts from lightly overruling past decisions, in order to heed the necessity for stability and predictability in the law. *See Gatts*, 279 Mont. at 51, 928 P.2d at 119 (citing *Morayne v. States Marine Lines* (1970), 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339, 358). At the same time, *stare decisis* is not a mechanical adherence to the latest decision and, of course, court decisions are not sacrosanct. *Gatts*, 279 Mont. at 51, 928 P.2d at 119 (citation omitted). A decision which is manifestly wrong need not be followed. *Gatts*, 279 Mont. at 51, 928 P.2d at 119

(citation omitted). It is my view that, in overruling *McAlpine*, the Court is merely substituting a result it finds preferable to that announced in our well-reasoned *McAlpine* decision. The Court makes no showing of manifest incorrectness here and, indeed, neither the EPA's *amicus* brief in *Etcheverry* nor the United States Supreme Court's decision in *Medtronic* provides an appropriate basis on which to resolve the present case by overruling *McAlpine*.

¶69 Starting with the U.S. Department of Justice's brief on behalf of EPA in the recent California *Etcheverry* case, I would give it no deference. This is not an internal policy or regulatory statement of the EPA regarding its administration of FIFRA of the type to which courts give deference. It is a brief prepared for litigation, part of the government's litigation strategy. Moreover, as the California Supreme Court observed,

> [e]ven though the question presented in this case has been addressed by nine of the federal circuit courts of appeals, the United States failed to file amicus curiae briefs in any of the cases and permitted those courts to proceed upon a fundamental assumption that it now characterizes as mistaken.

*Etcheverry, 993 P.2d at 374. In addition, the matter on which the EPA rests its contention that FIFRA does not preempt failure to warn claims relates to its waiver of review of pesticide efficacy claims. As was the situation in Etcheverry, however, the case before us does not relate to pesticide efficacy, that is, whether the pesticide will control the target pest(s). See Etcheverry, 993 P.2d at 374. The case before us involves the indoor application of Dursban without ventilation. Thus, as in Etcheverry, the EPA's argument is irrelevant to the case before us. See Etcheverry, 993 P.2d at 375. Under these circumstances, the Court's decision to give this johnny-come-lately litigation brief significant weight is a perilously slim basis on which to premise overruling our well-reasoned decision in McAlpine.*

¶70 Nor do I find *Medtronic* either useful or persuasive here and this no doubt explains why it was not called to our attention in *McAlpine*. As the Court notes several times, the portion of *Medtronic* on which it relies is a four-Justice plurality, clearly not controlling authority even if the MDA and FIFRA contained more similar preemption language. Indeed, it is my view, as it was the view of the California Supreme Court in *Etcheverry,* that *Medtronic* is distinguishable on the basis that Congress gave the Food and Drug Administration a unique role in determining the scope of preemption under the MDA. Congress did not give the EPA an analogous role in implementing FIFRA. *See Etcheverry*,

993 P.2d at 373 (citations omitted).

¶71 I would hold that *Medtronic* does not undermine our conclusion in *McAlpine* that FIFRA preempts state failure to warn claims. In doing so, I would join the overwhelming majority of courts which have examined the question in the wake of *Medtronic. See*, *e.g.*, *Grenier v. Vermont Log Bldgs., Inc.* (1st Cir. 1999), 96 F.3d 559; *Oliver v. Reckitt & Colman, Inc.* (M.D. Fla. 1998), 12 F.Supp.2d 1287; *Hawkins v. Leslie's Poolmart* (D. N.J. 1997), 965 F.Supp. 566; *Kuiper v. American Cyanamid Co.* (E.D. Wis. 1997), 960 F.Supp. 1378; *Koch v. Shell Oil Co.* (D. Kan. 1997), 173 F.R.D. 288; *Etcheverry*, 993 P.2d at 373; *Ackerman v. American Cyanamid Co.* (Iowa 1998), 586 N.W.2d 208; *Ackles v. Luttrell* (Neb. 1997), 561 N.W.2d 573, *cert. denied*, 522 U.S. 928 (1997); *Didier v. Drexel Chemical Co.* (Wash. App. 1997), 938 P.2d 364; *Lewis v. American Cyanamid Co.* (N.J. 1998), 715 A.2d 967; *Sherman v. Claire Mfg. Co.* (N.Y. App. Div. 1997), 657 N.Y.S.2d 453.

¶72 In my view, no showing has been made that *McAlpine* is "manifestly wrong." *See Gatts*, 279 Mont. at 51, 928 P.2d at 119. Therefore, I would apply *stare decisis* here, reaffirm *McAlpine* and affirm the District Court. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY