No. 02-073

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 292N

DEBRAH CARBERY,

    Plaintiff and Appellant,

    v.

TUNDRA HOLDINGS, INC.,

    Defendant and Respondent.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                In and for the County of Gallatin,
                The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Geoffrey C. Angel, Angel Law Firm, Bozeman, Montana

        For Respondent:

            Bill Hanson, Bozeman, Montana

                                        Submitted on Briefs:  May 23, 2002

                                        Decided:  December 12, 2002

Filed:

        _____
                            Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Upon termination of her employment, Appellant Debrah Carbery filed a complaint against her former employer, Respondent Tundra Holdings, Inc., in the Eighteenth Judicial District Court, Gallatin County, to recover allegedly unpaid wages and benefits. The District Court entered summary judgment in favor of Tundra and Carbery appeals. We affirm.

¶3 The sole issue on appeal is whether the District Court erred when it granted Tundra's motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On October 23, 2000, Carbery began working for Tundra Holdings, Inc., as a communications coordinator. On October 24, 2000, Carbery signed an employment agreement which memorialized the verbal employment arrangements. Among other things, the employment agreement outlined the policy for accrued vacation time and employment related benefits. As to vacation time, Carbery was entitled to "[o]ne week during year one and two weeks per year thereafter." Carbery's benefits package included participation in

a group health insurance plan, an annual performance-based bonus, and "an annual 5-day paid trip to Scott Lake Lodge."

¶5    During her first week of work, Carbery received a check for $430.19, the equivalent of one week's salary.  Throughout the following weeks, on November 4 and 18, 2000,  Carbery received biweekly checks in the amount of $860.38.  However, on November 22, 2000, Tundra's vice president terminated Carbery's employment. Following termination, Carbery received a check from Tundra in the amount of $1290.57 which accounted for her final week of work and a "two-week severance pay."  The parties appear to agree that Carbery received the equivalent of an eight-week salary for approximately four weeks worth of work.

¶6    Following her termination, Carbery demanded compensation for the one week of accrued vacation time, and either specific performance or the monetary value of the five-day paid trip to Scott Lake Lodge.  Initially, Tundra rejected Carbery's demands. Tundra ultimately made the Scott Lake Lodge available to Carbery as discussed in greater detail below.  However, on February 20, 2001, Carbery filed a complaint against Tundra in the District Court. The complaint alleged that Tundra "did not pay Debrah Carbery all her regular wages or fringe benefits," in violation of the federal Fair Labor Standards Act of 1938 and Montana's Wage and Wage Protection provisions at § 39-3-101, et seq., MCA.  Carbery sought to recover the alleged unpaid wages and benefits, liquidated damages, and costs and fees incurred in filing the action.

¶7 On July 25, 2001, Tundra filed a motion for summary judgment on the grounds that it "performed any and all contract duties it conceivably had to Carbery." Following a hearing on Tundra's motion, the District Court concluded that Carbery failed to present any material facts to support her contention that Tundra withheld the alleged compensation and benefits. Therefore, on December 12, 2001, the District Court granted Tundra's motion for summary judgment and dismissed Carbery's complaint with prejudice. Carbery appeals the order of the District Court.

## STANDARD OF REVIEW

¶8 We review a district court's grant of summary judgment de novo and employ the same Rule 56, M.R.Civ.P., analysis as the district court. *Sleath v. West Mont Home Health Services*, 2000 MT 381, ¶ 19, 304 Mont. 1, ¶ 19, 16 P.3d 1042, ¶ 19. In *Sleath*, ¶ 19, we set forth our inquiry as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

## DISCUSSION

¶9 Did the District Court err when it granted Tundra's motion for summary judgment?

¶10 Carbery maintains that Tundra has an absolute obligation to pay to her the wages and fringe benefits as delineated in the employment agreement. Specifically, Carbery seeks recovery of one

4

week of paid vacation and a five-day paid trip to Scott Lake Lodge. Carbery acknowledges that she worked for Tundra for approximately four weeks and, yet, received the equivalent of an eight-week salary. However, Carbery argues that a portion of the additional monies constituted a "gift of two weeks severance pay . . . [for] prematurely terminat[ing] Debrah Carbery's employment." Carbery contends that Tundra never intended the additional money to constitute compensation for her accrued vacation time. Therefore, according to Carbery, Tundra remains indebted to Carbery in the amount of her unpaid vacation time. As to the trip, Carbery admits receiving a Scott Lake Lodge invitation from Tundra following her termination. However, Carbery insists that the offer was unreasonable and that she had to incur unnecessary legal fees to induce the offer.

¶11 Carbery cites the federal Fair Labor Standards Act of 1938, generally, and § 39-3-205, MCA, for the proposition that an employee is entitled to any unpaid wages and benefits immediately upon separation from employment. Carbery does not dispute the fact that Tundra immediately tendered $1290.57 to her upon termination. Nor does Carbery dispute the fact that she received the equivalent of an eight-week salary for approximately four weeks worth of employment. However, Carbery disputes the characterization of the additional money as compensation for her accrued vacation time. Instead, Carbery insists that the extra money was a gift, or a severance package, which Tundra customarily bestowed upon terminated employees.

¶12 To determine whether Carbery was entitled to vacation pay, we must look to the terms of the employment agreement. *See Langager v. Crazy Creek Products, Inc.*, 1998 MT 44, ¶ 26, 287 Mont. 445, ¶ 26, 954 P.2d 1169, ¶ 26. The employment agreement simply provides, "Vacation: One week during year one and two weeks per year thereafter." The agreement remains silent as to when this benefit vests in a prospective employee. Although Tundra contends it never intended the interpretation proposed by Carbery, it concedes that, pursuant to the language in the agreement, entitlement to the vacation pay vested in Carbery upon commencement of her employment.

¶13 Therefore, Tundra acknowledges its obligation to reimburse Carbery for the vacation pay. Tundra notes that one week of paid vacation equates to $430.19. As indicated above, both parties agree that Carbery received payment in excess of the work she performed. Tundra insists that these excess payments more than satisfied its "vacation pay" obligation under the employment agreement. However, Carbery argues that the conditional severance package should not relieve Tundra of its obligation to reimburse Carbery for her accrued annual leave.

¶14 The employment agreement contains no reference to a severance package upon termination. Therefore, Tundra was not contractually obligated to issue such a package to Carbery. In theory, Carbery could raise genuine issues of fact regarding purported negotiations for the severance package sufficient to avoid summary judgment. However, by Carbery's own admission, the severance package simply accounted for two weeks of the four-week excess pay. Even if we

6

discount the severance package, the value of the residuary amount paid to Carbery still exceeds the value of one week of paid vacation. Since she in fact received a sum equal to and exceeding the value of one week's paid vacation, Carbery did not present any genuine issues of material fact that Tundra failed to pay her the vacation pay.

¶15 As for the trip to Scott Lake Lodge, Tundra's president signed and mailed the following letter to Carbery on February 12, 2001:

> Our letter agreement of October 12, 2000 states with respect to "Benefits," in part, "an annual 5-day paid trip to Scott Lake Lodge." While it was not my subjective intention to bind the company to provide such a trip to an employee who is terminated in the first two months of her employment, I can understand your position.
>
> Accordingly, this is to let you know that Tundra Holdings will provide you a 5-day trip to the Lodge. The dates we have open for you right now are August 20-25 and August 25-30. Please contact me at your earliest opportunity to confirm which dates you want and to make the necessary arrangements for your trip.

In preparation for trial, Tundra deposed Carbery and inquired into her receipt of the above letter. At the deposition, Tundra's attorney and Carbery engaged in the following colloquy:

Q: Do you recognize Exhibit 14?

A: Yes, I do, sir.

Q: And what is Exhibit 14?

A: This is a letter to me from Dale Trapp dated February 12th shown to me by my attorney.

. . . .
Q: Isn't it true that you have not as of this date contacted Mr. Trapp in response to that letter?

. . . .

A: I have not.

7

. . . .

Q: Isn't it true, Debrah, that you understand that this letter is an invitation for you to contact Mr. Trapp to make arrangements for a five-day paid trip to the Great Scott Lake Lodge?

A: My understanding of this letter is that he is honoring the employment agreement in respect to benefits which includes an annual five-day paid trip to Scott Lake Lodge.

Q: Do you understand from this letter that if you desire to take that trip, that it's necessary for you to contact him to make arrangements to go on it?

A: I understand that.

Q: Okay. And, again, just to clarify, you have not done that yet, you have not done that as of today?

A: I have not.

¶16  In her complaint, Carbery stated that "Tundra Holdings failed to pay Debrah Carbery the . . . fringe benefits to which she was entitled under the written compensation agreement . . . ." However, the above testimony contradicts this very proposition. Carbery admits in her deposition that Tundra extended the offer in an effort to "honor[] the employment agreement in respect to benefits." On appeal, Carbery claims that Tundra made an unreasonable offer only after she obtained the services of counsel. However, Carbery never attempted to contact Tundra in response to the offer. For the foregoing reasons, we conclude that Carbery has not presented any genuine issues of material fact to support her contention that Tundra failed to provide her with the fringe benefits as prescribed in the employment agreement. Accordingly,

8

we hold that the District Court did not err when it granted Tundra's motion for summary judgment.

¶17  Affirmed.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ TERRY N. TRIEWEILER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART