JUSTICE COTTER
delivered the Opinion of the Court.
¶ 1 The Plaintiffs/Appellants (hereinafter “the Miners”) include an on-site carpenter, seven former miners from Libby, Montana, and the wife of a former miner, all of whom have been diagnosed with asbestos disease. The Miners and their families have sued the State of Montana for negligence claiming that the State knew of the asbestos danger *394 associated with working in the Libby vermiculite mine but failed to warn them, or protect them by requiring the mine owners to correct the unhealthful conditions. The District Court granted the State’s Motion to Dismiss, concluding that the State had no legal duty to the Miners. The Miners appeal. We reverse and remand.
ISSUES
¶2 The Miners present the following restated issues on appeal:
1. Did the District Court err in ruling that the State had no statutory duties which ran to the Miners and their families?
2. Did the District Court err in ruling that the State did not have a duty of care to the Miners and their families by a special relationship under the public duty doctrine?
3. Did the District Court err in ruling that the State did not have a common law duty of care through foreseeability and an undertaking to provide industrial hygiene services for the benefit of the Libby mine workers and their families?
4. Can the doctrine of federal preemption provide a defense for the State in this case?
5. Does sovereign immunity insulate the State from the Miners’ cause of action?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 The Plaintiffs/Appellants in this case include seven former Libby miners and the wife of a former miner. The ninth Plaintiff is a carpenter formerly employed by a construction company who worked for the duration of his employment at the Libby mine. With due respect to the non-miner plaintiffs, we will refer to the entire group of Plaintiffs in this Opinion as “the Miners.” The Miners have all been diagnosed with asbestos disease. The Miners’ names and dates of work are: Herbert R. Orr, 1965-1967, Robert L. Graham, 1962-1990, Robert Dedrick, 1972-1973, Leonard D. Rice, 1968-1978, Donald R. Smith, 1951-1987, Opal A. Smith, (dates of husband Donald’s work) 1951-1987, James D. Jacobson, 1975-1976, Royce N. Ryan, 1974-1977, and Clayton H. Riddle, 1959-1962 and 1966-1969.
¶4 W.R. Grace Co. (Grace) purchased the existing Zonolite mine and mill in Libby, Montana (the Mine), in 1963. It owned and operated the Mine until 1990. The Mine extracted vermiculite from the ground and processed it using a procedure which generated substantial airborne dust containing tremolite asbestos. In 1956, when the State Board of Health (the Board or BOH) conducted an industrial hygiene study of *395 the Mine, it was already well-known that asbestos dust was a toxic inhalant. During the 1956 Mine inspection, the State did not perform analysis on any dust samples to determine an accurate asbestos concentration. Relying on the Mine’s records, however, it concluded that the maximum concentration of asbestos in the airborne dust would not “be greater than 25 to 30 mppcf.”[1] The State analyzed dust samples for asbestos concentration when it returned to the Mine in December 1958 and during subsequent inspections.
¶5 The State BOH performed inspections of the Mine in 1958,1962, 1963, 1964, and 1967. In 1966, the federal government undertook regulation of mine safety. As a result, from 1971 through 1976, the federal agency, accompanied by a State mining inspector, inspected the Mine and issued written reports. The State performed its own inspection in 1974, as well as assisting in the federal inspection for that year. The federal inspectors did not participate in any inspections after 1976. Between 1979 and the Mine’s cessation of operations in 1990, the State performed fourteen inspections of the Mine. It also performed two post-closure inspections in 1991 and 1992.
¶6 During each State inspection between 1956 and 1974, the State inspectors found unsanitary and unhealthful conditions. The State notified Zonolite, and later Grace, of the dangerous conditions after each inspection, explaining the seriousness of asbestosis and its likely fatal outcome, but did not inform the Mine workers, including the Miners, of the dangers. With the exception of identifying the hazardous conditions and telling the Mine’s owners/managers to correct the problems, the State took no steps to ensure that the Mine’s owners/managers responded in a manner that provided a safe working environment. Moreover, federal inspections between 1971 and 1975, in which State inspectors participated, revealed dangerous levels of asbestos dust in the Mine. The federal inspectors reported their findings to Grace, and provided copies of their reports to the State. The State did not notify the Miners or other Mine workers of the federal findings.
¶7 The Miners originally sued Grace for its failure to provide a safe working environment. Grace successfully avoided financial responsibility for these claims, however, by filing for protection under Chapter 11 of the federal bankruptcy laws in April 2001. The Miners *396 thereafter sued the State for its role in failing to protect them. They allege that the State negligently failed to warn them of the known dangers to all Mine workers and their families associated with working at the Mine, and that as a result of the State’s negligence, the Miners have suffered grave injuries and damages.
¶8 The State countered that it did not owe a duty to the Miners, and without such a duty, there could be no finding of negligence. On this and several other grounds, it filed a Motion to Dismiss. Without reaching all of the grounds for dismissal presented by the State, the District Court agreed that the State owed no duty to the Miners and therefore granted the Motion to Dismiss. The Miners appeal. We reverse and remand.
STANDARD OF REVIEW
¶9 We review de novo a district court’s ruling on a motion to dismiss pursuant to Rule 12(b)(6), M.R.Civ.P. Plouffe v. State, 2003 MT 62, ¶ 8, 314 Mont. 413, ¶ 8, 66 P.3d 316, ¶ 8 (citation omitted). “A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. In considering the motion, the complaint is construed in the light most favorable to the plaintiff, and all allegations of fact contained therein are taken as true.” Plouffe, ¶ 8 (citation omitted). We will affirm the District Court’s dismissal when we conclude that the plaintiff would not be entitled to relief based on any set of facts that could be proven to support the claim. Plouffe, ¶ 8 (citation omitted). The determination of whether a complaint states a claim is a conclusion of law, and the District Court’s conclusions of law are reviewed for correctness. Plouffe, ¶ 8 (citation omitted).
DISCUSSION

Statutory Duty

¶10 The first issue presented is whether the District Court erred in ruling that the State had no statutory duty which ran to the Miners and their families.
¶11 The Miners maintain that under the statutes empowering the State Board of Health and creating an Industrial Hygiene Division, the State had a mandatory duty to “make investigations” and “to disseminate information.” They claim the State made the investigations as required but failed to disseminate the critical information derived from the investigations.
¶12 The State argues that, for the following reasons, it had no *397 statutory duty to the Miners:
1. the industrial hygiene laws, relied upon by the Miners, granted the State certain powers but imposed no mandatory duties;
2. the industrial hygiene statutes did not expressly impose a duty upon the State to warn and protect the Miners;
3. an Attorney General Opinion issued in 1942 ruled that facility inspection reports were confidential and could not be disclosed to the public;
4. the industrial hygiene statutes restrict the State to reporting its inspection findings only “to the industries concerned”; and
5. protection of workers is the exclusive responsibility of an employer under Montana labor laws, and that the Miners’ theory of negligence would require “the State to foresee that Grace would not fulfill its legal obligations as landowner and employer.”
¶13 The District Court agreed with the State’s arguments. It noted in its Order that none of the statutes relied upon by the Miners contained the words “mine,” “asbestos,” or “miners.” This indicated to the court that “[t]he statutes deal with a general state of industry in Montana and with no specific form of industry or type of worker. With such being the case, it is hard to argue that the statutes... were designed to specifically provide a duty toward a certain type of industry or a certain type of worker.” We turn now to an examination of the State’s public health statutes which are at the center of the District Court’s decision.
¶14 The State Board of Health was created in 1907. Section 1474, RCM (1907). Until 1967, when the State Department of Health (the Department or DOH) was created, the BOH was responsible for the “general supervision of the interests and health and life of the citizens of the state.” Section 2448, RCM (1921); § 69-105, RCM (1947). As part of the BOH’s “functions, powers and duties,” the legislature mandated that the Board “shall make sanitary investigations and inquiries regarding the causes of disease;... causes of mortality, and the effects of localities, employments, conditions ... and circumstances affecting the health of the people,” among other things. The BOH was also charged to “gather such information in respect to all these matters as it may deem proper for diffusion among and use by the people....” See Sec. 2448, RCM (1921); § 69-105, RCM (1947)(as revised in 1961, Replacement, Vol. 4).
¶15 In 1939, Montana legislators created, within the BOH, the Industrial Hygiene Division (the Division). The legislature granted to the new Division, among other things, the power to:
*398 (1) make studies of industrial hygiene and occupational disease problems in Montana industries;...
(3) make investigations of the sanitary conditions under which men and women work in the various industries of the State;...
(5) report to the industries concerned the findings of such investigations and to work with such industries to remedy unsanitary conditions.
Sections 2(1), (3) and (5), Ch. 127, L. 1939. Additionally, § 7 of the new law provided that:
every physician, hospital or clinic superintendent, ... having knowledge of a case of occupational disease shall ... report the same to the division of industrial hygiene of the State of Montana .... All such reports and all records and data of the division of industrial hygiene of the State of Montana pertaining to such diseases are hereby declared not to be public records or open to public inspection, and shall not be admissible as evidence in any action at law or in any hearing under the workmen’s compensation act of the State of Montana.
Section 7, Ch. 127, L. 1939. Chapter 127 was subsequently renumbered and codified at §§ 69-201-208, RCM (1947).
¶ 16 In 1955, Montana lawmakers effectively eliminated the Industrial Hygiene Division by decreeing that the BOH “shall possess, exercise and administer all of the powers, functions and authority, and shall carry out, discharge and execute all of the duties, in the field of industrial hygiene” set forth in §§ 69-202-208, RCM (1947). Section 69-201, RCM (1947)(1961, Replacement, Vol. 4). Sections 202 through 208 remained unchanged. As a result, the BOH became exclusively responsible for the State’s programs for general public health and safety as well as occupational/industrial health and safety.
¶17 In 1967, the Montana legislature made further revisions to both the public health and industrial hygiene statutes. It created the DOH.[2] Section 1, Ch. 197, L. 1967. As a result of the creation of the Department, the functions and duties formerly allocated to the Board were divided between the Board and the new Department. The DOH assumed the responsibility to “make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public.” *399 Section 69-4110(3), RCM (1947)(1969, 2d Replacement, Vol. 4). Moreover, the DOH became responsible for administering the industrial hygiene program. Section 69-4105(1), RCM (1947)(1969,2d Replacement, Vol. 4). As a result, it was required to “investigate the conditions of work at any place of employment at any time,” and to “report the findings of investigations to the industry[3] concerned and cooperate with the industry in preventing or correcting conditions which are hazardous to health.’’Section 69-4203(3) and (4), RCM (1947)(1969, 2d Replacement, Vol. 4).
¶18 In 1971, the industrial hygiene statutes underwent further revisions. The new statute was known as the Occupational Heath Act (OHA) of Montana. Section 1, Ch. 316, L. 1971; § 69-4206, RCM (1947)(Supp. 1977). The declared policy and purpose of the OHA was:
(1)... to achieve and maintain such conditions at the workplace as will protect human health and safety, and to the greatest degree practicable, foster the comfort and convenience of the workers at any workplace of this state and enhance their productivity and well-being.
(2) To these ends it is the purpose of this act to provide for a coordinated statewide program of abatement and control of occupational diseases....
Section 69-4207, RCM (1947)(Supp. 1977).
¶19 The new Act mandated that, among other things, the BOH[4] adopt rules implementing the Act, establish threshold limit values of airborne contaminants, and issue orders necessary to carry out the Act. Under the OHA, the Department was granted various “powers.” These included the requirement that the DOH enforce orders issued by the Board, prepare and develop a comprehensive plan for the prevention, abatement, and control of occupational diseases, and that *400 it “collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases.” Section 69-4211.1(1), (3), and (7), RCM (1947)(Supp. 1977). The Department also had the power to take enforcement actions and impose monetary penalties on violators of the OHA. Section 69-4215 and 69-4221, RCM (1947)(Supp. 1977).
¶20 In addition, the OHA set out a specific “emergency procedure” to be implemented by the Department upon discovery of “a generalized hazard at a workplace” that “creates an emergency requiring immediate action to protect human health.” Section 69-4216(1), RCM (1947)(Supp. 1977). Under such circumstances, the Department was required to order the persons causing or contributing to the hazard to “reduce or discontinue immediately the emissions creating the hazard.” Section 69-4216(1), RCM (1947)(Supp. 1977). In the absence of a general condition creating an emergency, the Department was granted the discretion to order the persons responsible for “emissions from an operation ... causing imminent danger to human health” to reduce or discontinue such emissions immediately. Section 69-4216(2), RCM (1947)(Supp. 1977).
¶21 In 1978, the OHA was renumbered and became § 50-70-101 etseq, MCA. The section that had formerly referenced “Powers” of the Department now described “Duties” of the Department. As had been the language in previous versions, the Department was instructed that it “shall” perform these duties, including the duty to “collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases....” Section 50-70-105(7), MCA(1978). In 1999, this obligation became discretionary after the legislature changed the language from “shall” to the more permissive “may.” Section 50-70-105(7), MCA (1999).
¶22 The District Court concluded that none of the above-referenced statutes imposed a duty on the State to protect the Miners by warning them of the known dangers of working at the Libby Mine. The court, as noted above, found significance in the fact that none of these statutes specifically or expressly used the words “mine,” “asbestos” or “miners.” The court apparently concluded that because the statutes were not particular to vermiculite mines, they were not applicable to vermiculite mines. We disagree with this conclusion for several reasons. First, it cannot be disputed that vermiculite mining is “an industry.” If the failure of the legislature to describe every industry to which its law applies is followed to its logical conclusion, then the law *401 would cover no industries whatsoever. This is an absurd interpretation. A well-established maxim of our jurisprudence is that “[a]n interpretation which gives effect is preferred to one which makes void.” Section 1-3-232, MCA.
¶23 Second, while it is true that the statutes in their various forms specified obligations running from the Board or Department to the industries themselves, the duty to gather information related to the effects upon workers or the public of conditions of employment “for diffusion among and use by the people” was never displaced or eliminated from the law. The State had the mandatory obligation from 1907 through 1999 to gather public health-related information and provide it to the people. Section 2448, RCM (1921); § 69-105, RCM (1947); renumbered in 1969 to § 69-4110(3), RCM (1947); renumbered in 1978 to § 50-1-202(2), MCA. The legislature wrote this law broadly and chose not to limit it to specific industries, occupations or workers.
¶24 The dissent maintains that the Court estáblishes the existence of a duty “by incomplete references and misleading quotations from statutes of yesterday.” It specifically references our reliance on the phrase “for diffusion among and use by the people,” arguing that by “ripping [this] phrase” from the statute, the Court removed it from its context and from its meaning. The dissent neglects to note that in ¶ 14, when first describing this statute, we included the language deemed critical to the dissent’s analysis, i.e., the State BOH “shall gather such information in respect to all [statutorily-listed] matters as it may deem proper for diffusion among and use by the people ....” Section 69-105, RCM (1947)(as revised in 1961, Replacement, Vol. 4). A close reading of this statute can result in different interpretations depending upon whether the words “as it may deem proper” are paired with the beginning of the sentence or the end of the sentence. As a result, the plain language of the statute is ambiguous and must undergo statutory construction. Sink v. School Dist.(1982), 199 Mont. 352, 360, 649 P.2d 1263, 1267. (If possible, legislative intent must be inferred from the plain meaning of the words contained in statutes; only if there exists ambiguity in such wording should the court resort to the rules of statutory construction.)
¶25 Courts have developed many principles for interpreting statutes. Each principle is designed to give effect to the legislative will, to avoid an absurd result , to view the statute as a part of a whole statutory scheme and to forward the purpose of that scheme. See State v. Heath, 2004 MT 126, 321 Mont. 280, 90 P.3d 426. In the case before us, we conclude that the appropriate method of statutory construction is to *402 apply the grammatical rule of the “last antecedent,” which has been adopted by this Court. “Under the doctrine of the last antecedent’ relative clauses in a statute must be construed to relate to the nearest antecedent that will make sense; qualifying words and phrases should be applied to words or phrases immediately preceding, unless an extension or inclusion of others more remote is clearly required by a consideration of the entire Act.” State ex rel. Peck v. Anderson (1932), 92 Mont. 298, 13 P.2d 231; Butte-Silver Bow Local Govt. v. State (1989), 235 Mont. 398, 405, 768 P.2d 327, 331. Applying this rule here, we conclude that the words “as it may deem proper” are clearly intended to relate to the words preceding them rather than the words following them. As a result, we construe the statute to mean that the State had the discretion to determine what information to gather, but once that information was gathered, it had no discretion about whether to distribute it. We believe this construction forwards the purpose of the entire statutory scheme which was to create a State entity having “general supervision of the interests and health and life of the citizens of the state,” presumably for the protection of those citizens.
¶26 Finally, the District Court’s conclusion that the statutes do not apply to vermiculite miners is belied by its conclusion reached elsewhere that the industrial hygiene statutes obligated the State to report only to the industries concerned, and not their employees. Without belaboring the obvious, if the statutes are to be construed to protect the industries, then, by implication, they obviously apply to the Miners.
¶27 The District Court also placed great weight on Attorney General Bonner’s Opinion issued in 1942. The Attorney General was asked by the then-Secretary of the BOH whether the State’s reports of the workplace investigations should be furnished to anyone requesting them. Attorney General Bonner responded by quoting § 7 of Chapter 127 (See ¶ 15 above), and concluding that the BOH’s reports are “not public records nor are they open to public inspection. They are, therefore, confidential in character.” Both the State and District Court emphasize that for years, subsequent legislatures did not change this provision nor express their disagreement with Attorney General Bonner’s conclusion.
¶28 It is difficult to understand how the Attorney General then, and the State and the District Court in the instant litigation, could conclude that a prohibition against the publication of the medical records of a person with an occupational disease was tantamount to a *403 prohibition against dissemination of the results of a workplace investigation. The Secretary of the BOH sought an opinion on whether to furnish the results of workplace investigations to those requesting them; he did not ask if he could disseminate medical records. The Attorney General’s response to the Secretary’s inquiry was a non sequitur. Given the disparity between the opinion sought and the answer provided, it is somewhat bewildering that this Opinion was relied upon for years to justify the concealment of the results of workplace inspections.
¶29 It is apparent that § 7 of Chapter 127 was written to protect the confidentiality of a patient’s medical records, not to prohibit the State from disclosing information derived during workplace inspections. This interpretation is reinforced by the section title given when § 7 was codified and renumbered as § 69-207, RCM (1947)-“Duty of physicians and others to report cases - reports private records.” As we have frequently held, “[t]he title of an act is presumed to indicate the legislature’s intent.” Dept. of Rev. v. Puget Sound Power & Light, 179 Mont. 255, 263, 587 P.2d 1282, 1286. This presumption applies equally to titles of sections within an act. As written in 1939 and revised to date, the section protects the privacy of a person diagnosed with occupational disease and prohibits health care workers from disclosing this person’s medical records or anyone from using these private medical records as public documents. It balances the need of the State to know of such occupational disease diagnoses against the individual patient’s right to privacy. Section 7 clearly does not, however, apply to or constrain the dissemination of the results of workplace inspections.
¶30 It seems clear that either Attorney General Bonner misinterpreted the question, or the BOH misconstrued the answer. The unfortunate result of their individual or combined failings was the State’s decision to withhold from the workers at the Libby Mine investigation reports that revealed that they were being exposed to deadly toxins on a daily basis. Moreover, the language of the original § 7 interpreted by Attorney General Bonner was significantly revised by the legislature in 1967. The result of the legislative revision was to clarify § 7 in a manner that continued to prohibit health care workers from disclosing private medical records but that rendered Attorney General Bonner’s Opinion moot.
¶31 We next address the State’s argument that protection of workers is the exclusive responsibility of an employer under Montana labor laws, and that the Miners’ theory of negligence would require “the *404 State to foresee that Grace would not fulfill its legal obligations as landowner and employer.” We conclude that the State’s argument is disingenuous.
¶32 In August 1956, when the State inspected the Mine “to determine if any of the components of the operation ... were detrimental to the health of the employees,” it discovered significant quantities of airborne dust. It knew that there was an unknown concentration of asbestos in the dust but did not analyze the dust to determine an exact asbestos content at that time. It did, however, using Zonolite’s estimated concentrations of 25 to 30 mppcf, report to Zonolite the dangers and toxicity associated with breathing asbestos particles.
¶33 The State returned to the Mine in December 1958 to determine if the components of the Mine’s operation identified in 1956 as detrimental to the Workers had been reduced or alleviated. During the inspection, it analyzed the asbestos content of the dust in several locations in the plant and discovered that the concentration of asbestos particles was significantly greater than the maximum allowable concentrations established by official federal public health agencies. In February 1959, a Zonolite employee was diagnosed with far advanced pulmonary tuberculosis and questionable asbestosis. He spent several days in the State Tuberculosis Sanitarium in November 1959 and died of asbestosis-related congestive heart failure in October 1961. Additionally, another Zonolite employee died in October 1961 of atherosclerosis and pulmonary fibrosis.
¶34 The State BOH inspected the Mine again in March 1962 and discovered that the Mine’s environmental health had deteriorated significantly. Of twenty discrete dust samples, fifteen produced asbestos levels far in excess of the MACs. Two samples exceeded the allowable limits by more than seven times while nine other samples exceeded the limits by four to six times. The State Industrial Hygiene engineer even noted in his letter submitting the report to Zonolite that the State was “disappointed with the lack of progress made in dust control.”
¶35 The State investigated the Mine again in April 1963. Of eight dust samples analyzed for asbestos content, all eight had asbestos concentrations from two to six times greater than the MACs. In early 1964, another Mine employee died from asbestos-related congestive heart failure.
¶36 In sum, between 1956 and early 1964, the State inspected the plant four times; it received the death notices of three Mine employees from asbestos-related diseases, and had identified a deteriorating and *405 increasingly dangerous workplace. Surely, the State would have noted in its 1958 and 1963 reports if Zonolite or Grace had posted warning signs to employees, provided safety equipment, arranged for medical monitoring, or established safety procedures to protect the employees from ever-increasing concentrations of asbestos in airborne dust.
¶37 The State argues that it could not foresee that the Mine owner would not fulfill its legal obligations as landowner and employer. This rings hollow in light of obvious and objective indications that neither Zonolite nor Grace was protecting its employees. Plainly, the State knew as a result of its inspections that the Mine’s owner was doing nothing to protect the workers from the toxins in their midst. The question of whether the risks were foreseeable had been answered as early as 1956; the dangers to the workers were already clear and present by that time. In fact, the District Court specifically found:
[I]t could be fairly said that since 1956, the state of Montana was on notice that the asbestos dust at the Libby mine was dangerous and that the mine owner was not making improvements as recommended by the State. Also, it appears that the record is bereft of any actions taken by the State to warn the miners or the Libby townspeople of their plight.
¶38 The State’s argument that it owed no duty to the Miners ignores the State’s statutory obligation to “make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public.” Section 69-4110(3), RCM (1947X1969,2d Replacement, Vol. 4). More significantly, the State’s argument that it had no duty to the Miners disregards the provisions of § 69-4202, RCM (1967-1971), which required the State to “correct or prevent conditions which are hazardous to health at any place of employment.” Obviously, hazards to health at a place of employment can only affect the people who work there. The provisions of this law bound the State to do something to correct or prevent workplace conditions known to be hazardous to health.
¶39 The statutory duties of the State thus ran to the public and to persons whose employment subjected them to health hazards. Had the legislature intended to limit the State’s role to that of industry advisor, presumably it would have both expressed that intent and avoided declarations of duties to others. It did neither. We cannot “omit what has been inserted” into these statutes. Section 1-2-101, MCA.
¶40 Having concluded that the State had statutory duties to the public and to persons confronted with workplace health hazards, we turn *406 next to the question of whether application of the Public Duty Doctrine would preclude a finding of liability on the part of the State to the Miners.

The Public Duty Doctrine

¶41 The State argued, and the District Court agreed, that the principles of the Public Duty Doctrine (PDD) would preclude a finding of liability on the part of the State to the Miners. Citing Nelson v. Driscoll (1999), 295 Mont. 363, 983 P.2d 972, the court concluded that a duty to the public is a duty to no one in particular, and is thus not enforceable in a negligence action. While acknowledging that an exception to the PDD exists when there is a special relationship between the government agency and the plaintiffs giving rise to a special duty, the court concluded that no special relationship existed in this case. The Miners, on the other hand, contend that a special relationship did exist between them and the State, and that the Public Duty Doctrine would therefore not preclude a finding of liability on the part of the State.
¶42 As we explained in Nelson; a special relationship giving rise to a special duty can arise in one of four circumstances. Such a relationship can be established (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff. Nelson, ¶ 22.
¶43 The District Court concluded that no special relationship existed because: (1) the statutes were too general to protect a specific class of persons from a particular type of harm; (2) the government did not undertake a specific action to protect a person or property; and (3) the Miners could not establish that they detrimentally relied upon the government’s inspections. We disagree with the District Court’s conclusions.
¶44 The numerous statutes discussed above were intended to protect workers from occupational diseases. As we stated above, the lack of specificity in these statutes does not render them meaningless. The statutes were designed to protect men and women working in the various industries in Montana from occupational disease. Libby Miners are undeniably members of this specific class of persons.
¶45 Secondly, the State repeatedly returned to this specific Mine, year *407 after year, for the express purpose of determining “if any of the components of the operation of [the Mine] were detrimental to the health of the employees.” And as the District Court expressly found, this question was answered in the affirmative. Such a recurring undertaking-at this place in particular-surely qualifies as a “specific action to protect a person” and creates a special relationship between the State and the Miners.
¶46 Lastly, the Miners presented affidavits indicating that they were concerned about the ambient dust, but had concluded that the dust did not pose any health risks or danger. This conclusion was uniformly premised on the fact that the State had regularly inspected the Mine, but had never reported any danger to the Miners. Each Miner declared that they relied on these State inspections and the State’s lack of warning to continue working at the Mine. In Montana, reliance occurs when one is “rightfully led to a course of conduct or action on the faith that the act or duty will be properly performed.” Nelson, ¶ 36. The State’s inspections “rightfully led” the Miners to believe that they were working in a safe environment.
¶47 Under these circumstances, we conclude that the State had a statutory duty under § 2(5), Ch. 127, L. 1939, § 69-202(5), RCM (1947), § 69-4203(4), RCM (1947)(1969, 2d Replacement, Vol. 4), § 69-105, RCM (1947), § 69-4105(1), RCM (1947)(1969, 2d Replacement, Vol. 4), and § 69-4110(3), RCM (1947)(1969,2d Replacement, Vol. 4) to protect the safety and health of the Miners by warning them of known dangers associated with their workplace. We also conclude that, by virtue of the special relationship between the State and the Miners, the State is not shielded by the application of the Public Duty Doctrine.

Common Law Duty

¶48 The Miners ask that we also determine whether the District Court erred in ruling that the State did not have a common law duty of care to them. Having determined that the State of Montana had a statutory duty to the Miners, it is unnecessary that we determine whether the State also had a common law duty.

Federal Preemption

¶49 The Miners also challenge the District Court’s failure to rule on the applicability of the doctrine of federal preemption to this case. The State claimed federal preemption in the District Court and Miners moved for partial summary judgment to strike the preemption defense. However, the District Court dismissed the case without ruling on the issue. The Miners request on appeal that this Court establish whether the doctrine of federal preemption applies to this case. Because this *408 issue will, in all likelihood, be raised again upon remand, in the interest of judicial economy and resolution of this case, we address it now.
¶50 Both the United States Supreme Court and this Court disfavor preemption. “Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action. In all preemption cases, ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Sleath v. West Mont Home Health Services, 2000 MT 381, ¶ 23, 304 Mont. 1, ¶ 23, 16 P.3d 1042, ¶ 23 (citing Medtronic, Inc. v. Lohr (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 and Cipollone v. Liggett Group, Inc. (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422). This presumption against preemption “can only be overcome by evidence of a ‘clear and manifest’ intent of Congress to preempt state law.” Sleath, ¶ 61 (citing Wisconsin Public Intervenor v. Mortier (1991), 501 U.S. 597, 610, 111 S.Ct. 2476, 2484, 115 L.Ed.2d 532, 546).
¶51 As we stated in Favel v. American Renovation and Const. Co., 2002 MT 266, 312 Mont. 285, 59 P.3d 412, in determining whether a federal law preempts a state law, including a common law cause of action, we look for evidence of Congressional intent to do so. As noted by the Miners, and explained in Favel, there are three ways in which state law may be superseded by federal law. First, Congress may expressly include a preemption clause in the federal statute. Such an express clause would make it clear that state law will not apply in the area governed by the federal statute. Second, congressional intent may be implied where it is reasonable to conclude that Congress intended to “occupy the field” by such comprehensive regulation that there is no room for supplementary state regulation. Lastly, federal law may preempt state law when the state and federal law actually conflict with one another. Such a conflict occurs when it is impossible to comply with both the federal and state law, or because “the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Favel, ¶ 40 (citing Hillsborough County v. Automated Medical Labs. (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721; see also, Suislaw Concrete Const. v. Wash., Dept. Of Transp. (9th Cir. 1986), 784 F.2d 952, 955).
¶52 The Miners argue that prior to 1966 no federal statutory or regulatory scheme governing the Libby Mine existed. As a result there can be no federal preemption defense available to the State for its *409 Mine-related activities prior to 1966. In 1966, Congress passed the Federal Metallic and Non-Metallic Mine Safety Act (the FMNMSA). In looking for Congressional intent vis-a-vis preemption, we note the following provision in the FMNMSA:
(a) Conflict with this chapter
No State or territorial law in effect upon the effective date of this chapter or which may become effective thereafter, shall be superseded by any provision of this chapter, except insofar as such State or territorial law is in conflict with this chapter, or with orders issued pursuant to this chapter.
30 U.S.C. § 738(a). This provision was carried forward to the Federal Mine, Safety and Health Amendments of 1977 that repealed the FMNMSA and consolidated non-coal mine safety with coal mine safety. 30 U.S.C. § 955(a). Just as preemption will be found only in those situations where it is “the clear and manifest purpose of Congress,” (Rice v. Santa Fe Elevator Corp. (1947), 331 U.S. 218, 230, 91 L.Ed. 1447, 1459, 67 S.Ct. 1146, 1152), it will not be found when there is a clear intent to the contrary. Because Congress affirmatively disclaimed any intention to preempt state law with the FMNMSA or the amendments, there is no need to further analyze this issue. We conclude the FMNMSA and its amendments do not preempt state law in this case.

Sovereign Immunity

¶53 Lastly, the Miners ask that we determine whether sovereign immunity applies to this case. While the District Court dismissed Miners’ Complaint without addressing this issue, as with the issue of federal preemption above, it is appropriate that we resolve it prior to remand. To our knowledge, this is a matter of first impression for this Court. For background, a brief discussion of sovereign immunity is warranted.
¶54 Originally, sovereign immunity protected the early kings of England from suit in the King’s Court. However, the doctrine evolved into protecting governmental entities from liability for the negligent acts of their officers and employees. It was adopted by this country’s legal system during the nineteenth century. Barry L. Hjort, The Passing of Sovereign Immunity in Montana: The King is Dead! 34 Mont. L. Rev. 283 (1973). The first Montana case embracing sovereign immunity was Langford v. King (1868), 1 Mont. 33, 38, holding that citizens may not sue the territorial government absent the government’s consent. The Montana Constitution of 1889 neither authorized nor prohibited sovereign immunity. Thus, Montana courts, *410 as did other courts throughout the country, struggled throughout the twentieth century to apply the doctrine with consistency and reason. Hjort at 289-93. In 1972, the Delegates to the Montana Constitutional Convention joined several other states in concluding that the doctrine was an anachronism. The Delegates inserted Art. II, § 18, into the Declaration of Rights of the Montana Constitution. Article II, § 18:
State subject to suit. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property. This provision shall apply only to causes of action arising after July 1,1973.
Article II, § 18 became effective on July 1, 1973. However, the last sentence of this Section was deleted in 1975, as a result of voter initiative. It is against this historical backdrop that the sovereign immunity issue in this case arises.
¶55 However, before presenting our analysis, we find it necessary to address remarks contained in the dissent. The dissent maintains, without citation to authority, that sovereign immunity is not merely a bar to suit but is actually a legal doctrine to the effect that the government owes no duty to its citizens. This is incorrect. Immunity is a matter of avoidance, an affirmative defense. Brown v. Ehlert (1992), 255 Mont. 140, 146, 841 P.2d 510, 514. The sovereign immunity defense does not mean that there is an absence of duty; rather, at the time that the immunity defense exists, the breach of duty is simply not actionable against the sovereign. The statutory scheme in effect in the 1960's is illustrative. Prior to the abrogation of sovereign immunity, § 40-4402, RCM, adopted in 1963, provided that an insurer for the state or its political subdivision who received a premium from the state for liability insurance, could not-in a suit against the state-“raise the defense of immunity from suit in any damage action brought against such insured or insurer [under certain circumstances]... and if the verdict exceeds the limits of the applicable insurance, the court shall reduce the amount of such judgment or award to a sum equal to the applicable limit stated in the policy.” See Jacques v. The Montana National Guard (1982), 199 Mont. 493, 505-06, 649 P.2d 1319, 1326. If, as the dissent posits, sovereign immunity meant there was no duty owed by the State, then there would be no reason for the existence of this statute, because no cause of action, much less an adverse verdict, could have gone forward against the State under any circumstance. ¶56 The State argued that because all but one of the alleged negligent acts complained of by the Miners occurred before July 1, 1973, it should be immune from liability for those breaches of duty. The Miners *411 responded that the sovereign immunity law in effect at the time the State’s breach of duty occurred is irrelevant; the applicable sovereign immunity law is the one in effect at the time their tort claim accrued. They maintained that because the tort of negligence requires four elements-duty, breach of duty, causation and damages-their claim did not accrue until their “damages” became manifest in 1998, when they were medically diagnosed with asbestos-related illnesses. Therefore, they asserted that it is the sovereign immunity law in effect in 1998 that is applicable to their case.
¶57 The precise question of whether pre-1972 or post-1972 sovereign immunity law controls in this unique situation has not been squarely presented to or answered by this Court. The obvious reason for the absence of authority in this area is that, typically, the elements of a tort happen, and the cause of action accrues, at the same moment in time. A vehicle strikes a pedestrian, a man falls from a faulty scaffolding, a nursing home employee injures her back while lifting a patient-in each of these instances, the wrong occurs and the damage immediately results. Here, the wrongs occurred in the 1960's but the damages did not manifest until 20 years later. In other words, the elements of the tort did not occur simultaneously. At least one Montana case suggests that, when the elements of the tort are bisected by the abrogation of sovereign immunity, it will be the law in effect at the time the injury occurs that applies.
¶58 In Jacques, the defendant State of Montana appealed from a verdict entered in favor of Jacques and against the Montana National Guard and the State of Montana for injuries sustained by the plaintiff in an explosion that occurred in February of 1977. The Plaintiff, employed at the Anaconda Smelter, had his legs traumatically amputated when a large shell that a co-worker had found nearby, exploded. According to the testimony, the shell had been left by the National Guard in an old firing range nearby, between the years 1956 and 1966. However, the shell remained on the ground undetonated until 1977. Thus, sovereign immunity was in full force and effect at the time that the tort or the wrong occurred, which was when the explosive shells were negligently left on the ground by the National Guard. The damage was not sustained by the plaintiff, however, until the explosion occurred five years after the abolition of sovereign immunity, in 1977.
¶59 The State in Jacques argued that the law in effect prior to the abrogation of sovereign immunity should control, thereby limiting its exposure to the applicable insurance limits in effect as of 1963. The *412 Court, however, refused to do so, concluding that because sovereign immunity had been abolished in 1972, sovereign immunity, and statutes related to it, could not be raised as a defense. Thus, while the tortious breach of duty obviously occurred between 1956 and 1966, the court declined to apply the law in effect at the time of the wrong and instead applied the law in effect at the time the damage occurred.
¶60 Three courts from other jurisdictions have examined cases under the unusual circumstances presented here. We look to them for additional guidance. State v. Ford, 2001 MT 230, ¶ 22, 306 Mont. 517, ¶ 22, 39 P.3d 108, ¶ 22.
¶61 In March 1944, a military plane crashed just outside of Birmingham, Alabama. A 14-year old boy, Carnes, and his friends went to the crash scene shortly after the crash occurred. They also visited the scene several other times during the cleanup operations, during which time guards were posted. The boys were allowed to take “souvenirs” from the site. Unbeknownst to Carnes and his parents, he had salvaged an explosive device that, in February 1945, exploded and seriously injured him.
¶62 The trial court held that because the negligent act of the Government had occurred before January 1, 1945, the Government was immune and the court had no jurisdiction. The Tenth Circuit disagreed because the boy’s cause of action accrued when his injury occurred, which was after January 1,1945. The language of the court is helpful:
Actionable negligence consists of the violation of a duty to another with resulting injury to him. This is elementary and needs no citation of authorities to support it. The correct rule is well stated in Schmidt v. Merchants Despatch Transportation Company, 200 N.Y. 287, 200 N.E. 824, 827, 104 A.L.R. 450, where the court said: “We have said that ‘in actions of negligence damage is of the very gist and essence of the plaintiffs cause.’ .... Though negligence may endanger the person or property of another, no actionable wrong is committed if the danger is averted. It is only the injury to person or property arising from negligence which constitutes an invasion of a personal right, protected by law, and, therefore, an actionable wrong.”
Appellant did not have a claim against the Government until he suffered injury upon which he could have predicated an action in court. It will be noted that the Act gives the court jurisdiction of actions on claims (10th Cir. emphasis) accruing on or after January 1,1945. The claim accrued, if at all, on February 2, 1945, *413 when appellant was injured. Prior to that time he had no claim against the Government. He could not have sued the Government. His cause of action, if any he had, accrued on the date he suffered his injury. Under the clear language of the Act, the court had jurisdiction of the cause of action predicated upon this claim.
Carnes v. United States (10th Cir. 1951), 186 F.2d 648, 650. See also Diminnie v. United States (6th Cir. 1984), 728 F.2d 301 (Plaintiffs claims for assault, battery, false imprisonment, false arrest, and malicious prosecution all accrued at the time of his original arrest and indictment in 1973. Therefore, the Federal Bureau of Alcohol, Tobacco and Firearms was immune from suit because the FTCA had not yet been enacted.)
¶63 In Windham v. Florida Dept. of Transp. (1985), 476 So.2d 735, the First District Court of Appeals of Florida was asked to review a trial court’s decision dismissing the plaintiffs’ complaint for damages and injuries arising from contaminated groundwater. According to the facts, in 1959, the Florida DOT hired a contractor to pave a section of Florida highway. The contractor used trichloroethylene (TCE) to clean his equipment and when he finished, he buried the drums of TCE in the ground without any attempt to safeguard against their leakage. At the time these drums were buried, the State of Florida enjoyed sovereign immunity.
¶64 In 1974, the Florida legislature passed a statute that waived sovereign immunity for “incidents occurring on or after” January 1, 1975.
¶65 In 1976, the Windhams bought the property adjacent to this unknown drum burial ground and drilled a well. For six years, they drank water from this well. They began experiencing various health problems and their first born child was born with a rare form of eye cancer requiring surgical removal of the infant’s eye. In 1982, the environmental regulatory agency sampled their water and found the odorless, colorless, and tasteless TCE. The Windhams sued the State of Florida DOT for various torts, including negligence. Windham, 476 So.2d at 736.
¶66 The court concluded the State was immune from suit because the “negligent acts or omissions such as those alleged here, occurring prior to the statute’s effective date, may not be utilized as the basis for a cause of action for injuries materializing after the effective date.” Windham, 476 So.2d at 739. The Florida court reached its conclusion by interpreting the language of the 1974 statute that waived sovereign immunity. It concluded that the term “incident” is defined as *414 “occurrence” or “happening,” and determined that the “incident” in the Windham case was the wrongful act causing the injury, not the actual injury itself. Windham, 476 So.2d at 739. Moreover, the Florida court concluded that interpreting “incidents occurring” as synonymous with “causes of action accruing” would be inconsistent with other provisions of the same state statute which specifically addressed accrual of actions. Windham, 476 So.2d at 739.
¶67 Justice Ervin wrote a strong dissent wherein he vociferously disagreed with the majority opinion that he said “bifurcates the traditional definition of negligence.” He stated, “the majority states that the duty and breach thereof... can be separated from the actual injury sustained by plaintiffs minor child. This construction ... is at variance with common principles of tort law.... It is axiomatic that no cause of action can exist for negligence, even assuming the existence of the negligent act, where no damage can be proven.” Windham, 476 So.2d at 742.
¶68 These cases illustrate that courts first look to the precise language of the immunity waiver statute to determine when a governmental entity is immune from liability, and when it is not. This rule of statutory construction is familiar to this Court. “General rules of statutory construction require this Court to interpret the statutory language before us, without adding to, or subtracting from, it. Section 1-2-101, MCA. Words and phrases used in statutes of Montana are construed according to the context and the approved usage of the language. Section 1-2-106, MCA. Therefore, when interpreting statutes, this Court will use the plain and ordinary meaning of a word.” Carroll v. W.R. Grace & Co., (1992), 252 Mont. 485, 487, 830 P.2d 1253, 1254.
¶69 Montana, of course, did not waive immunity by statute but rather by constitutional provision. This distinction, however, does not change how we interpret the language. Looking closely at the language adopted by the Delegates, “[t]he state... shall have no immunity from suit for injury to a person ...,” we conclude that the critical phrase we must interpret is “suit for injury.” According to the Webster’s Dictionary, a suit is “an action or process in a court for the recovery of a right or claim.” Black’s Dictionary, 7th Edition, defines suit as “any proceeding by a party or parties against another in a court of law.” Certainly, under the common usage of the words, the Miners’ claim qualifies as a “suit for injury.”
¶70 The State seeks to bifurcate its alleged negligent acts from any injuries they ostensibly caused. It maintains that because it was *415 immune at the time it purportedly committed the acts, it retained that immunity from “suits for injury” regardless of when the suit or injury arose. We disagree and for the reasons stated below, conclude that the Delegates’ choice of the phrase “suit for injury” incorporated the legal concept of “accrual.”
¶71 More than one hundred years ago and prior to statehood, Montana codified the law relative to commencement of a civil action and a statute of limitations.
Civil actions can only be commenced within the periods prescribed in this article, after the cause of action shall have accrued, except where, in special cases, a different limitations is prescribed by statute. (Emphasis added).
Section 28, Laws of Montana, C.Civ.Proc. 1879. With minor language revisions and frequent renumbering, this statute remains essentially unchanged. See Sec. 470, MCA, C.Civ.Proc. 1895; § 6428, RCM (1907); § 9011, RCM (1921) and (1935); § 93-2401, RCM (1947); § 25-1-102, MCA (2003). “Cause of action” is defined by Black’s Law Dictionary, 7th Edition, as “a group of operative facts giving rise to one or more bases for suing.” By the time of the Constitutional Convention in 1972, one hundred years of Montana jurisprudence stood for the proposition that a “suit for injury” could only be commenced upon an accrued cause of action. Thus, the State has no immunity for causes of action accruing after July 1, 1973. Next, we must determine when the Miners’ cause of action accrued.
¶72 Usually, all of the elements of a negligence claim occur in rapid succession. A duty is breached and the plaintiff is immediately injured as a result. With asbestosis, the paradigm is far different. There is no dispute that asbestosis can take years to manifest. One person exposed to the toxins in the Libby Mine may become ill within months of exposure while another may remain symptom-free for decades. Some may never become ill at all. And so it was with these plaintiffs. The Miners in this case worked for the Mine anywhere from one year (Jacobson/1975-1976) to thirty-six years (Smith/1951-1987). Despite the differences in exposure, both men developed asbestosis. Mr. Smith was diagnosed in July 1998, and Mr. Jacobson was diagnosed in April 2000. Miner Graham worked for the Mine from 1962 until it closed in 1990. He died from mesothelioma in January 1998, not long after diagnosis. Although we make no finding here as to when the disease became manifest for each plaintiff, it does not appear from the record before us that any of the plaintiffs were symptomatic as early as 1973.
¶73 Prior to the adoption of the “discovery rule” in Montana and *416 many other states, plaintiffs such as the Miners were precluded from bringing an action because the statute of limitations, formerly linked with the breach of duty element, would have expired. The “discovery rule” was adopted by the majority of states because it fairly allows injured plaintiffs to seek relief for long-dormant injuries caused by tortious conduct that occurred much earlier. Section 27-2-102, MCA.
¶74 In Montana, no cause of action, or suit, for negligence accrues until all elements of the claim exist. Section 27-2-102, MCA, provides:
(1) For the purposes of statutes relating to the time within which an action must be commenced:
(a) a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action;
(3) The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
(a) the facts constituting the claim are by their nature concealed or self-concealing;
¶75 This Court has long embraced the discovery rule. See, e.g., Johnson v. St. Patrick’s Hospital (1966), 148 Mont. 125, 417 P.2d 469. We have applied the above-stated provisions of § 27-2-102, MCA, on numerous occasions. See Nelson v. Nelson, 2002 MT 151, 310 Mont. 329, 50 P.3d 139 (Cause of numerous bovine vaccine injection-related illnesses not discovered for several years after negligent injection; cause of action accrued upon discovery.) See also Gomez v. State, 1999 MT 67, 293 Mont. 531, 975 P.2d 1258; Hando v. PPG Industries, Inc. (1989), 236 Mont. 493, 771 P.2d 956; Kaeding v. W.R. Grace & Co. CONN, 1998 MT 160, 289 Mont. 343, 961 P.2d 1256; Cechovic v. Hardin & Associates, Inc. (1995), 273 Mont. 104, 902 P.2d 520.
¶76 While Montana’s statutory version of the discovery rule governs the time within which an action must be commenced, its provisions are nonetheless instructive on the question of when a Montana cause of action accrues. A cause of action accrues “when all elements of the claim... exist or have occurred.” Section 27-2-102(l)(a), MCA. The causes of action of the surviving Miners did not accrue until damage could be proven. And no damage could be proven until their *417 injuries were manifest.
¶77 Two Pennsylvania cases support the proposition that the discovery rule as announced in the statute of limitations’ context, should apply as well in a sovereign immunity analysis.
¶78 In Hench v. Carpenter (1985), 35 Pa.D. & C.3d 401, the Township’s sewage officer committed a negligent act in 1976 at which time the Township did not enjoy sovereign immunity. Hench’s injury from this negligent act was concealed for several years but eventually became manifest. When he sued the Township in August 1983, the Township argued that the two-year statute of limitations barred Hench’s suit. Hench claimed that the two-year statute of limitations was tolled by the “discovery rule,” and that his claim did not accrue until February 1983 when he discovered the injury and cause. The Township countered that by the time Hench’s claim accrued under the discovery rale, the Township had enacted a sovereign immunity statute and was immune. Siding with the Township, the court agreed, stating:
Plaintiffs claim it is the breach of the duty which gives rise to the cause of action. Since this duty was breached on June 24, 1976, they argue governmental immunity should be applied as of this date. However, the effect of the discovery rale as applied to the statute of limitations, is to delay the accrual of a cause of action from the time of defendant’s negligent conduct to when the injury becomes known or knowledgeable to the plaintiff [citation omitted]. Consequently, in this case if the discovery rale is applied for statute of limitations purposes the cause of action accrued on February 3, 1983. This is logically the point in time when the governmental immunity defense should be applied.
Hench, 35 Pa.D. & C.3d at 405-06.
¶79 The court further opined that the plaintiffs cannot argue for statute of limitations purposes that their cause of action did not arise until six years after the Township’s negligent act, but then argue for immunity purposes that the cause of action arose at the time of the Township’s negligent act. Hench, 35 Pa.D. & C.3d at 405-06. See also Hurst v. East Hanover Township (1984), 33 Pa.D. & C.3d 157. This logic is both simple and compelling. It is inconsistent to apply the discovery rule to the accrual of a cause of action for statute of limitation purposes, but then discard it when conducting a sovereign immunity analysis.
¶80 For the foregoing reasons, we conclude that the long-standing rule in Montana that civil actions are to be commenced after a cause of action has accrued, should apply to our sovereign immunity analysis *418 here. A “suit for injury” accrues once the elements of the cause of action have accrued. The elements of the causes of action before us did not accrue until well after sovereign immunity had been abrogated. Therefore, we conclude that the existence of sovereign immunity prior to July 1,1973, does not insulate the State from the Miners’ causes of action.
CONCLUSION
¶81 A final word about the dissent. It accuses this Court of creating a remedy out of thin air. The accusation is off the mark. First, our decision here does not create a duty where none existed as the dissent argues; rather, it stands simply for the proposition that because the affirmative defense of immunity no longer existed at the time the Miners’ causes of action accrued, it can present no bar to their causes of action. Second, this is a case with complex legal issues. The difficult questions presented by industry standards forty years old and the unusual delayed onset of the Miners’ injuries advance novel questions of law. Had the issues here been simple, presumably the dissent would have said so quickly and with direct authority on point; it would not have required fifty-seven paragraphs to explain its disagreement with the majority. The simple truth is that the law attendant to these facts is both untested and arguably susceptible to different interpretations. Contrary to the dissent’s insistence, we have not handed the Plaintiffs a remedy-they still face the daunting task of establishing that the State breached its duty to them and in so doing, caused their damages and injuries. What we have concluded is that a fact finder must make these determinations.
¶82 Based upon the foregoing, we conclude the District Court erred in determining that the State had no legal duty to the Miners, and in dismissing the Miners’ complaints. We therefore reverse the District Court’s Order of Dismissal and remand for determination by the fact-finder of whether the State breached its duty to the Miners, and if so, whether such breach caused the damages claimed by them.
JUSTICES REGNIER, NELSON and LEAPHART concur.

 mppcf is the acronym for “millions of particles per cubic foot of air.” At that time, according to the State’s report, the maximum allowable concentration (MAC) of asbestos in airborne dust was 5 mppcf.

 Subsequently known as the Department of Health and Environmental Sciences, § 69-4102(2), RCM (1947)(Supp. 1977) and the Department of Public Health and Human Services, § 50-1-101(2), MCA (1997).

 We note that the dissent accuses the Court of relying on “incomplete references and misleading quotations” from past statutes. One such statute to which the dissent refers is § 69-4203(4), which, as quoted here, contains the language required for the dissent’s analysis. In this instance, the dissent apparently narrowly defines the word “industry” as used in § 69-4203(4) to mean the employer or the management group of a facility as opposed to the workers and laborers who, in actuality, make up an industry. The term “industry” is not defined in the statute; therefore it must be given its ordinary meaning. Mont. Vending, Inc. v. Coca-Cola Bottling Co., 2003 MT 282, 318 Mont. 1, 78 P.3d 499. Without supporting authority, the dissent defines the term “industry” to exclude the workers who comprise it. Applying this narrow definition to a Department of Health program designed to safeguard the health of these very workers runs contrary to its purpose.

 Renamed the Board of Health and Environmental Sciences by the OHA. Section 69-4208(11), RCM (1947)(Supp. 1977).